Good morning, Edward Pilot for the Petitioner of Guinea, Paula Dabo. Immigration didn't take much of your client's honesty. Much of my client's what, John? Honesty. Well, let me get to that. My client has the legal right to be questioned in the language in which he is most fluent. On no fewer than five occasions he advised the court that English was the language that he understands best and in which he can formulate his most coherent answers. The court and government counsel felt that they had trouble understanding Mr. Dabo's accent, so the court coerced Mr. Dabo into using Kauze, his least fluent language, and the language in which he was least able to understand and formulate proper answers. Can you explain to me, is that because in Nigeria there's different dialects? So if there was a dialect that would have been better, what would that have been? Thank you, Your Honor, yes. Your Honor is correct. There are several languages spoken in Nigeria. Kauze is one of them. My client, on the record and in his I-589 application, has set forth that he was fluent in another of the languages in Nigeria, this one named Yoruba. So the court put it to him, between Yoruba and Kauze, which one are you more proficient in, Mr. Dabo? And Mr. Dabo testified he was more proficient in Yoruba. So what does the immigration court do? It compels Mr. Dabo to testify in Kauze. Now, was that issue taken to the BIA? Yes, Your Honor. Did the BIA address that? Not specifically, Your Honor. Not at all? Not at all. How was it taken to the BIA? On appeal. I mean, in what manner did you present this to the BIA? It seems mysterious to me that they don't even talk about it. Well, that, unfortunately, has been par for the course with the BIA. Well, but did somebody then make a motion to reconsider, a motion to say, hey, what happened to my communication issue? Was there anything like that? I brought up the communication issue related to the adverse credibility finding. And the answer is no, that once we were denied at the BIA, we came directly to this court. This is what the finding was on that, which I thought was a little odd. The immigration judge, he says, oh, there is a Hausa interpreter present today. The respondent appears to understand him, so let's go with that. I mean, if there had been a Yorta or Yorba interpreter. Yorba. Yorba there today, maybe they would have gone with that. It just seemed pretty arbitrary to just choose someone who just happened to be present to be the interpreter. Absolutely, Your Honor. And not only that, Your Honor, but the Hausa language interpreter advised the court at the very onset that he had anticipated a problem in the ability, his ability to communicate properly with Mr. Dabo and vice versa. This appears at transcript 106, line 25 through 107, line 6. So the immigration court brushes that aside and concludes that Mr. Dabo and the Hausa language interpreter do understand each other and in fact forbids Mr. Dabo to use English. Again, forcing Mr. Dabo to converse in a language in which he is least fluent because the court did not understand his accent is highly prejudicial. Excuse me, is this an issue that's raised before us? I said in the blue brief. It is insofar as we speak of how it impacts the adverse credibility findings. And let me get to a couple of examples of that that I do raise. But you don't specify that as an issue. It's only something that you use in attacking the credibility findings. Correct, Your Honor. Why didn't you make it an issue, especially when you start out with it as a stand-alone issue? Well, is it a stand-alone issue? I mean, I thought our cases said it is relevant to the adverse credibility. I believe that almost all of the questions regarding Mr. Dabo's credibility can be traced back one way or another to the immigration courts having compelled him to testify in Hausa. And one issue that I do raise, and it's raised in the IJ's oral decision and it's raised in my brief, pertains to where Mr. Dabo lived after his father, who is a Muslim leader and teacher, was able to secure Mr. Dabo's relief from jail. Had Mr. Dabo been permitted to testify in English, he could have clearly communicated the fact that he was living in one of three houses which were owned by his father. That house was separate and apart from the house in which his father was living. This entire area of inquiry became garbled and confused by the English to Hausa and Hausa to English translations as reflected in the words, father's house, compound, neighborhood, and distance. The confusion would not have arisen had the immigration courts simply allowed Mr. Dabo to testify in English. On redirect, Mr. Dabo tried to clear up this confusion, but the court simply dismissed him as a fabricator and lacking credibility. Now, another stark example of how forcing Mr. Dabo to use Hausa was highly prejudicial arose when the issue of whether or not Mr. Dabo lost consciousness as a consequence of his having been tortured. Mr. Dabo did not know the Hausa language worked for consciousness and wanted to use English instead. However, the court would not let him do so and instead directed me as his counsel to inquire about Mr. Dabo's symptoms. This appears at 116 lines 9 through 20 of the transcript. This was extraordinary prejudicial because in describing his symptoms, Mr. Dabo did not testify that he lost consciousness because he doesn't know that word in Hausa and the court forbid him to use English. Excuse me. The judge to Mr. Dabo, sir, you've listed the languages that you speak fluently on your application as Hausa, English, and Yoruba. Yes, sir. Is there any other language you speak fluently? I think English is still the best language. Mr. Pilot to Mr. Dabo, are you fluent in Hausa? Answer, yes, I can speak Hausa. Are you fluent in Yoruba? Yes. Are you fluent in English? Yes. And he says he's fluent. Yes, Your Honor, but if you will allow me. And the court's having a hard time. The court seems to be motivated only by a desire to understand fully what the case is all about in his testimony. Let me address your concerns in order of presentation. At 101.10-12, Dabo testifies that he's more proficient in Yoruba than Hausa. But he does say he's, well, we're beating this to pieces here, but he says he speaks it fluently, and he put that in his declaration. That is correct. I mean, I grew up in Mexico. I speak Spanish. I speak English better, but I'm fine in Spanish. He also speaks to the fact that Hausa was the language that he used when he was a small child growing up. Hausa is consistent with northern Nigeria with Muslims. Mr. Dabo was born Muslim. He converted to Christianity. Yoruba is more consistent with Christianity. So at some point in his life, he essentially stopped speaking Hausa and went to Yoruba and really English. But the court's concern for a person's diction is not resolved by forcing that person to testify in the language in which he's least fluent. Well, least fluent doesn't mean, you know, you can't function well enough in that language to participate. You know, as I said, lots of people are better in one language. People who speak multiple languages are probably better in one than another. It doesn't mean the other is deficient. No, I, for example, Your Honor, I speak Spanish. I'm a pretty good Spanish conversationalist. If I were seeking asylum in Mexico or Spain or Argentina, I would want English. Well, that's you. Well, there's a lot of other issues. Yeah, that are more important. But, I mean, this related, I guess. So he testified in English that he passed when he was being beaten. I guess it was three times he was being beaten. Testified in English that he became unconscious, lost consciousness. And the judge said, no, no, no, if you don't know the word in Hausa, just say that. We're not going to go back and forth. That's the part of his language. I mean, and then he finds him a liar because he's testifying to what he thinks is correct in English. And so he finds him not believable. That's what I don't get. Absolutely correct, Your Honor, and I'm as befuddled as you are. But let me just harken back to Justice Trott's last comment. We were both talking in the theoretical, but the practical was now we get the Hausa language interpreter in court, and a combination of my client not understanding Hausa as well as he understands the other languages, differences in dialect and colloquialisms and whatnot, it's brought to the attention of the immigration judge at the earliest opportunity that, hey, Your Honor, there's a problem here. And again, we cannot, there are other remedies that would not deprive him of his basic rights here. English has many more words than Hausa. The American legal system is based on English, while Hausa has many words and concepts unique to Nigeria, therefore preventing Mr. Dabo from using the language upon which our legal system is based and most compatible is a serious handicap to him. Okay, but why don't you respond to the arguments about the underlying reasons that the IJ gave for finding him not credible? Well, sure, yes, Your Honor. He found my client not credible because of the question as to where he lived after he was released from jail, and I've addressed that. And that's with the father or not with the father? Correct, Your Honor. In other words, the father is the owner of three houses in a particular neighborhood or neighborhoods. One house the father lived in, another house was set aside for family member or members, and the third house was rented. The major reason seemed to be that he was asserting that Sharia law existed during a certain time frame, and the country report said no, it wasn't. And when your client was given an opportunity to explain, your client said the country report's wrong. Is that pretty much capsulized? Well, except for the very last portion of what you said. Let me talk about that. My client was arrested on three occasions. First, on September 9, 1998, he said he was arrested by a group of Muslims and put in a jail. Now, the country report says that the Muslims didn't take over in Kaduna and impose that Sharia law two years after that. I think it's a distinction of, let's say, de facto versus de jure. Muslims were certainly in northern Nigeria. They were there, but the question is, did they operate a jail? Well, yes, Your Honor, it's a multi-tiered analysis. We may have a date in which a formal imposition of Sharia law takes place. However, that does not mean, and I believe it's a little naive to think that that doesn't mean that once they seize power that they don't immediately start imposing their will. As to a formal jail, we're not speaking of the Twin Towers. We can take an abandoned farmhouse or a warehouse and convert that into a jail. So I think that is – we're engaging in a little quibbling when we talk about whether or not there's an existence of – I'm surprised that the government would not acknowledge the existence of Islamist fundamentalists in northern Nigeria in the late 90s. Well, there are Muslim fundamentalists all over. Sometimes they control the government. Sometimes they don't. My impression is it was at least two years before they took over the government. Well, my client's testimony was they were there. They were more powerful than the government. It's certainly – the history is replete of the murder of Christians, the burning of churches. It's there now, today. One of his arrests certainly postdated the formal imposition of Sharia. The BIA also says, referencing the testimony, that your client changed it.  Well, the inference was his father taught the Koran, was a Muslim. That didn't seem to make much sense. And that's when he said, well, he just lived at his father's house. Was that a change of testimony? No, not at all, Your Honor. If you look at the I-589 application, he lists that he lived in the same house from 1984 until the end of 2002 when he came to the United States. So there's absolutely no change of testimony. Did he ever say he lived with his father after the conversion? I do not believe so. There was – and I spoke of some of the garbled and confusing – that's why I don't want to minimize the house-English distinction. But it was clear by the end of the proceedings that his father had three houses. At no time from 1984 to 2002 did he live under the same house as his father. And that the house that he did live in was 20 to 30 minutes away from the house in which the father lived in, that he felt ostracized. So I don't believe that there's anything inconsistent there, Your Honor. All right. Thank you, counsel. Okay. Now, I would like to reserve my remaining time here for – You don't have any remaining time. You're way over your time. We'll give you a minute or two at most. Ah. I'm looking at the clock and it says time remaining, but – I think that's time over, isn't it? Yes. Time over. Time over your time. Thank you. I appreciate the Court's indulgence and willingness to give me a couple minutes and then we'll go on. Thank you. May it please the Court, Matthew Hansperlock. I represent the United States of America. I did notice in your brief you say that everything you said about the merits of the asylum claim is simply dicta. I believe what was in the brief was that there was language in the immigration judge's decision that said – basically, the immigration judge had an alternative finding of fact with regard to the asylum claim. I guess it didn't in your brief say that's all dicta. The first instance, the I.J. did not rule on the merits of the asylum claim. After the I.J. denied it, as untimely, he included the following dicta. If that's what you told us in the brief, I assume we shouldn't consider that issue. Well, I don't believe that's entirely correct, Your Honor. Your brief's not entirely correct. Did you write this brief? No. No, Your Honor. That's often the case, right? Somebody else writes it. Is it going to disavow the brief? And waives the whole argument. It doesn't matter whether you wrote it. You disavow it. Well, I think – I think, first of all, looking just at what the immigration judge was saying in regard to asylum was simply that even though there may be – the one-year asylum bar may not be an issue. I remember he said he didn't – the brief says he didn't rule on the merits of the asylum claim, that it's only dicta. I don't think he – can you disavow your brief? I mean, this is the brief. This is your argument. I don't think you can disavow it. I believe what I would say is dicta may not have been the appropriate word, but I think what he was saying is that he didn't clearly say that it applied to both the asylum claims. What do words mean that didn't rule on the merits of the asylum claim? Well, I think – That's very, very ambiguous, isn't it? I think it was – let me say this. I would say that the focus should be on what the immigration judge said and what was affirmed by the Board of Immigration Appeals. Well, what are we – which decision are we reviewing? Well, what I believe that particular paragraph in the response brief is referring to is referring to the issue of the one-year asylum bar. And basically the immigration judge just said even if he did meet the one-year asylum bar, I would still reject his asylum application based on my adverse credibility determination. That, I believe, is what that paragraph is referring to. All right. I think both sides have some problems with the way they presented the issues. Go ahead and talk about whatever issues you would like. Sure. If I may, I would start out with regard to the board's adverse credibility determination, which basically the issue is does the record compel the conclusion that Mr. Debo was telling the truth in his testimony in support of his applications for asylum withholding and protection under the Convention Against Torture? Now, which issue are you talking about with asylum? Are you talking about the bar or the merits? I'm talking strictly about the adverse credibility finding, which is obviously specifically addressing withholding and the Convention Against Torture issue. But I would also argue that if you find that the adverse credibility determination is correct, I would say that basically the asylum application would also be covered by that because all the merits decision on the withholding and cap is basically covered by adverse credibility. Okay. So you want to talk about the credibility issue now? Certainly. There's nothing in the record at all whatsoever, notwithstanding what we've heard here today, that compels the conclusion that Mr. Debo was, in fact, credible during his testimony. First, I would go back to what we heard a little bit earlier. We heard some that the testimony in regards to his, whether he lived with his father after he was released by the Muslim extremists was garbled and confused. But it wasn't garbled and confused because of an issue with an interpreter. It was garbled and confused because he was not credible. It was backtracking on his testimony. And that's clear from a read of the transcript. I would also note that the language in regards to whether he was unconscious and whether or not that was a proper interpretation of what the Petitioner was saying, I would say that that was not even mentioned by the immigration judge in regards to whether Mr. Debo was even determined to be credible. That particular fact was not even mentioned. Where was he backtracking in the transcript? What page of the excerpt? Well, in terms of going back and forth between after his release in September 99, I would direct the Court to Administrative Record page 140. There was some talk about did he ever say that he lived with his father. He clearly said he lived with his father. He was asked very specifically.  I would argue that this issue wasn't even briefed in the first place, and therefore it's not even appropriate before this Court. He didn't raise the issue of the language of the interpreter whatsoever in his brief before this Court. In regards to whether that is affected by the Irish credibility issue, that's not raised in the brief either. There's no discussion at all in terms of whether he was credible or not based on the quality of the interpretation of the immigration judge. But to get that issue, then, and tell us the credit, where did he go back and forth? Yes, Your Honor. Mr. Debo's testimony that he was arrested in September 1998, where he was imprisoned by the fanatical Muslims for three months, initially testified that he was released to his father, who was a local Muslim teacher, on the pledge that he would then convert from Christianity back to Islam. Yes. He testified very clearly that why weren't you expelled? Initially, he said because my father did not have the heart to expel me at that point. Okay. But that's the question was about whether he lived with his father or not. Isn't that where he said he went back and forth? Correct. Okay. So just try to ask where in the record does it show that he went back and forth? Well, I would direct you to Administrative Record, page 140, where he says I lived with my father. Then on Administrative Record, page 150, then he starts to talk about, well, I didn't exactly live in the same house with my father, but I lived in the same compound. Why did you say earlier you lived with your father until you left? No, I was actually saying that my father owns a place. He's the owner of the house. Right. Three in the same neighborhood. Yes, and that was after he made the claim that, actually, I lived in the compound, and then that changed into, as it was becoming clear, that the questioning was going to the heart of, well, how did your... Did you live by yourself? Yes. Were you paying rent to your father? No, I wasn't paying rent. So that's what you're referring to. Yes, Your Honor. Exactly. After earlier saying he lived with his father and his father was trying to convert him and all that. Yes, Your Honor. Okay. I would also argue that the interrogation judge also found that Mr. Davis' claim to be in conflict with the background evidence, that would obviously have nothing to do whatsoever with the interpreter quality or whatnot. He clearly said the Department of State 2000 country report indicates that plans for implementing Sharia law were not introduced until 2000. Right, but those very same reports also say that there were Sharia groups of Muslims that were killing people and running rampant and having criminal... I don't know if it's called criminal. I don't understand which side is the criminal side. They were in northern Nigeria in particular active in kidnapping and punishing people, caning people. There was an incident of a caning of a Christian trader because he drank gin. Yes, Your Honor. And this is all pre the official implementation of Sharia according to the reports. And that would make sense, actually, that if a group was going to come and overthrow the government, they wouldn't necessarily be able to do it instantaneously and implement their law instantaneously. And that's what these reports seem to reflect. I would argue, Your Honor, that the implementation of Sharia law in a particular region as addressed in those reports is a very specific occurrence. It wasn't just a discussion about... The point is that Muslim Sharia groups that the government was unable to control were running rampant before the actual date of the implementation of the law or the overtaking of the government in that particular part of Nigeria. If I may, Your Honor, I think the reason why it's very important in this particular case is because Mr. Gabel's original claim of why he was persecuted was that he was distributing flyers that were opposing the implementation of Sharia law. Right, and that's before he implemented it, right? Think about a revolution. You would be circulating pamphlets well in advance of taking up arms and... Thomas Paine. Exactly. That's exactly what I'm thinking about, is that you're sitting there saying, Sharia law, they're going to come, they're going to come over. I'm against this. I'm a Christian. I believe in freedom of religion. I don't see why that would be not believable at all. I mean, it's happened in history before. It was because the Department of State reports were very specific about in certain regions. It wasn't just a random thing that occurred. It was the implementation... of whether you could oppose Sharia law before it was implemented. Is there anything else about the fact that he says he was put in jail for opposing Sharia law and held for months in jail? Well, he was specifically asked, Your Honor, and this is on administrative record, page 164, was Sharia law being implemented in your town of Kaduna as early as 1998? He answered, Yes, it was, which is in direct conflict with the Department of State reports. And along the earlier question about, well, these things were all occurring, you had demonstrations. In fact, one other discrepancy that was noted by the immigration judge, which is particularly important, was in the 2000 Department of State report, the Department of State identified a particular incident on February 24, 2000, where there were demonstrations after the implementation of Sharia law that killed upwards of 1,500 people in Mr. Devo's town. But that wasn't part of his claim. He wasn't claiming he was killed as part of those riots. That's correct, Your Honor. But you would expect in his testimony about asylum... But he was not in the riots. His testimony has to do with three incidences of his being seized or arrested or That's correct, Your Honor. But you would expect that in his testimony, and this is what the immigration judge's point was, is that he was in this town and he was a practicing Christian at the time, one would expect that he would at least mention that there were riots in his town at a time when the immigration judge found that he was in the town, he was not, he wasn't arguing that he was imprisoned at that time, that he would at least mention that this was somehow an impact on his life in his own town. And this is something that's very specifically noted in the Department of State report, and his testimony is completely silent on that particular issue. I think that's just another example of the Department of State reports aren't matching up with what his testimony was. What's the situation there today for Christians? Honestly, Your Honor, it's really not particularly relevant because it's not... Well, we're basically constrained by what's in the administrative record up until this case was briefed, I believe, in 2005. Well, what's in the record shows that Sharia law was implemented and that that involved persecution of Christians. Right. Your Honor, I guess I would argue to counter that, that there's actually, there's no evidence whatsoever that he was in fact a practicing Christian in Nigeria because there was an adverse credibility finding. The immigration judge had no idea what to believe about Mr. Davo's past or if he even was in Nigeria during these time periods because there's no other evidence supporting that. Do you have any idea, by the way, why these briefs were filed three years ago and the case is being heard now? No, Your Honor. I don't know the answer to that question. All right. Thank you. Two minutes is an absolute maximum. You've been way over your time. Does that include your questions? Yes, it includes everything, including the time you're taking now. I'll be quick. Just addressing what I heard. Counsel seems to be engaging in sort of the same rank speculation that the immigration judge did about my client's lack of presence or testimony regarding a particular demonstration upon which Judge Wardlaw recognizes that my client's case is not based. Reciting his basis for asylum is not a chronicle of every anti-Christian incident that happened in his hometown. Now, at page 149 of the record, it's clear it's the same neighborhood but it's not the same house. It's not the same compound. We are apart. We are distant. Okay. Now, the issue of that language and its impact on the adverse credibility finding was briefed. It's pages, subheading C, pages 9 through 11, the top of 11. So that issue was briefed, and the court can take a look at that after my two minutes are up. The situation today is obviously dire for Christians in many parts of Nigeria where the Muslims are in control. I brought with me today both the 2008 State Department report and the International Report on Religious Persecution that chronicles many murder of Christians and burning of churches. So the situation is the same or worse than it is today. And simply in closing, I would like to say that irrespective of the immigration courts quibbling as to when Islamic Sharia law was finally adopted, there's no denying that Sharia law is now the law in Mr. Gabo's homeland. Under Islamic Sharia law, if we send Mr. Gabo back to Nigeria, they will again attack his genitals and this time likely put a dagger through his heart. Thank you. Thank you. The case that's argued will be submitted. The next case is United States v. Casillas.
judges: Reinhardt, Trott, Wardlaw